**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| MAXEL MORELAND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EQUIMINE INC. d/b/a PROPSTREAM, a California Corporation<br><br>Defendant. | Case No. 1:26-cv-03200-WJM-MDB |

---

# PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

---

Plaintiff Maxel Moreland ("Plaintiff") brings this class action complaint against Equimine Inc. (hereinafter "Equimine" or "Defendant"), a maker of sales software operating the publicly accessible online directory available at www.propstream.com. This action asserts violations of Colorado's Prevention of Telemarketing Fraud Act ("PTFA"), Colo. Rev. Stat. § 6-1-301, *et seq.* These allegations are grounded in counsel's investigation and are presented upon information and belief, except for those directly concerning Plaintiff, which are based on personal knowledge.

## INTRODUCTION

1. This complaint seeks redress for Equimine's pervasive practice of compiling and commercially disseminating the cellular telephone numbers of Colorado residents without their explicit, affirmative consent. This conduct directly contravenes the letter and spirit of the PTFA, a vital piece of consumer legislation designed to protect the privacy of individuals, particularly regarding their mobile phone numbers, which are widely regarded as personal and private communication channels.

2. The Colorado General Assembly enacted the PTFA with a clear legislative declaration recognizing the rapid increase in commercial telephone solicitation and the unique risks and potential for abuse it presents. The legislature found that "widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest." Colo. Rev. Stat. § 6-1-301.

3. To address these concerns, an amendment to the PTFA, HB05-1288, was signed into law on May 27, 2005, explicitly prohibiting the commercial listing of a cell phone number in a directory without the owner's permission, effective September 1, 2005. This amendment aimed at protecting individuals from the misappropriation of their personal information and to uphold privacy in an increasingly digital world. Specifically, Colo. Rev. Stat. § 6-1-304(4) states:

(a) On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:

(I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

4. This prohibition is designed to protect privacy. As former State Representative Mark Cloer,[1] a prime sponsor of HB05-1288,[2] stated in describing this new portion of the PTFA: "[m]ost people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important."[3]

5. Despite this clear statutory prohibition, Defendant operates a website, www.propstream.com, which functions as a data aggregator, openly collecting and listing personal information—including cell phone numbers, job history, and email addresses— without explicit consent. This data, sourced from various public records and third-party data brokers, is made readily available to anyone with internet access. Equimine monetizes this personal data, including the cell phone numbers of Colorado residents, through its publicly accessible directory, thereby profiting from the unauthorized disclosure of private information.

6. This alleged conduct is not merely a technical violation; it exposes individuals to significant risks. The Federal Trade Commission ("FTC") has long warned about the potential dangers associated with data brokers, including the facilitation of harassment, stalking, identity theft, and vulnerability to fraudulent schemes.[4] Equimine's readily accessible compilation of personal data, including cell phone numbers, creates a fertile ground for malicious actors to exploit this information for harmful purposes, such as scams, phishing, and doxxing.

---

[1] *See* https://www.leg.state.co.us/clics2005a/directory.nsf.

[2]https://www.leg.state.co.us/CLICS2005A/csl.nsf/fsbillcont3/1BB0D3E00348AC6987256F9000 7C20C7?Open&file=1288_enr.pdf

[3] https://www.9news.com/article/news/local/politics/legislative-library-feb-23-2005/73-344789916.

[4] https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparencyaccountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

7. Plaintiff brings this action to compel Defendant to cease its unlawful practices, protect the privacy rights of Colorado cell phone users, and recover statutory damages provided by the PTFA.

## PARTIES

8. Plaintiff Maxel Moreland is, and has been at all relevant times, a resident of Manitou Springs, Colorado. Plaintiff's cellular telephone number was listed by Defendant in its directory, available at www.propstream.com, for commercial purposes. Defendant never requested, and Plaintiff never provided, affirmative consent, through written, oral, or electronic means, for such listing. In fact, Plaintiff has no relationship with Defendant whatsoever and did not discover Defendant's use of his personal information until shortly before filing this suit. Plaintiff's cellular telephone number is a personal mobile line used exclusively for personal communication with family, friends, and trusted associates. Plaintiff pays a monthly carrier fee to maintain the cellular line and does not advertise or hold out his mobile number to the general public for business or commercial purposes. Plaintiff treats his cellular telephone number as private personal information. Plaintiff has never authorized Defendant or any data broker to publish, list, or sell his mobile number.

9. Defendant Equimine Inc. is a California corporation with its principal place of business in Lake Forest, California. At all times during the class period, Defendant owned and operated the website with the URL www.propstream.com.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act or "CAFA") because: (a) the proposed Class contains more than 100 members; (b) there is minimal diversity between the parties, as Plaintiff Maxel Moreland is a citizen of Colorado and Defendant Equimine Inc. is a California corporation with its principal place of business in California; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This action was originally commenced in state

court and was removed by Defendant to federal court on June 12, 2026, pursuant to 28 U.S.C. §§ 1441 and 1446 (ECF No. 1).

11. This Court has specific personal jurisdiction over Defendant pursuant to Colo. Rev. Stat. § 13-1-124 and the Due Process Clause of the United States Constitution because Defendant purposefully directs its commercial data-broker activities at Colorado and Colorado residents. Specifically, Defendant harvests real estate title data across Colorado, compiles and indexes the private cellular telephone numbers of thousands of Colorado residents, and commercially disseminates and unmasks that Colorado mobile data for profit on propstream.com, causing injuries in Colorado directly arising from those commercial contacts.

12. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and statutory privacy violations giving rise to Plaintiff's and Class Members' claims occurred in this judicial district. Venue is also proper pursuant to 28 U.S.C. § 1404(a) following the court order transferring this action to the District of Colorado on July 15, 2026 (ECF No. 23).

## FACTUAL ALLEGATIONS

### OVERVIEW OF THE PROPSTREAM DIRECTORY

13. Equimine operates as a data broker, gathering and then re-selling or sharing consumers' personal information. It provides a comprehensive real estate search for investors agents, and brokers by compiling vast amounts of real estate data from diverse sources, including public records, multiple list service feeds, and other data brokers.

14. The website, www.propstream.com, functions as a public real estate directory, allowing anyone on the internet to search by address for individuals owning title to a property:




15. Upon a search, the site provides comprehensive information about the property. For example, below is an example of the information provided when searching for Plaintiff's address (address redacted):




16. Once a property is found, users of the website can perform a "skip trace" of the property to reveal the contact information of its owners. Below is an example of the confirmation screen that appears when a user requests a skip trace:




17. Once a skip trade is performed, users may view the contact information of the property's owners, including mobile phone numbers, landlines phone numbers, and emails addresses. Below is an example of the information revealed when Plaintiff's property is skip traced:




18. Equimine sells access to individuals' cell phone numbers and email addresses through "Skip Trace Credits," which are available for customers to purchase via subscription plans.

19. The collection and dissemination of these personal details, including cell phone numbers, serves a vital commercial purpose for Defendant. Data brokers like Equimine generate income primarily by selling access to and information about private citizens. This inherent commercial value of the data collected underscores the violation of the PTFA when consent is not obtained.

20. Defendant directly profits from its data publishing activities by selling subscription access for the ability to search for contact information—including cell phone numbers—about individuals, including Colorado residents. Selling individuals' contact information is the core of Equimine's business model, notwithstanding the fact that it offers a one-week free trial period.

**DEFENDANT'S PRE-COMPILED DIRECTORY ARCHITECTURE AND PAYWALL MECHANICS**

21. Defendant's central database is not a passive property research tool, nor does a "skip trace" trigger an external, real-time search from third-party sources. Rather, Defendant maintains a pre-compiled, indexed commercial directory containing cellular telephone numbers covering nearly every adult in the country—boasting on its website that its skip trace database "covers 98% of the US adult population."[5]

22. The "skip trace" function described above operates merely as a front-end User Interface ("UI") paywall designed to unmask and monetize cellular telephone numbers that Defendant has already harvested, matched, structured, and listed within its central database.

23. Demonstrating that cellular data is pre-compiled and listed prior to purchase, Defendant's system confirms that a match already exists in its database before a subscriber spends any credits or completes a transaction. As shown in the order confirmation screen, prior to placing an order, Defendant's UI explicitly notifies the user: "Selected Contacts: 1" and "Eligible Contacts: 1."

---

[5] https://www.propstream.com/news/what-is-skip-tracing-and-why-do-you-need-it




24. Once unmasked through the UI paywall, Defendant automatically organizes these cellular telephone numbers into a dedicated, searchable "Contacts" directory section within the subscriber's account, where users can view, filter across millions of contacts, rank phone numbers, and export structured marketing lists.

25. Furthermore, Defendant specifically designs and markets its directory to facilitate unsolicited commercial telemarketing and cold-calling campaigns. Defendant equips PropStream with integrated outbound dialing software, including "Click-to-Dial" (for single cold calls) and "Dialer Campaigns" (for cold-calling entire exported lists), and integrates directly with third-party auto-dialers such as BatchDialer.[6]

26. Defendant is fully aware that its database functions as a commercial telemarketing directory. Demonstrating this knowledge, Defendant automatically pre-categorizes telephone line types ("Mobile" vs. "Landline") and pre-scrubs all phone numbers against federal and state Do Not Call (DNC) registries—displaying visual "Do Not Call (DNC)" badges next to listed cellular numbers—specifically so commercial telemarketers can navigate cold-calling compliance.[7]

27. EquiMine does not perform live, external "skip traces"—such as querying third-party credit bureaus or public record repositories in real time—when a user clicks "Place Order." Instead, EquiMine has already harvested, parsed, linked, and stored Colorado cellular telephone

[6] https://www.propstream.com/campaigns

[7] https://www.propstream.com/news/free-dnc-flagging-with-propstreams-skip-tracing-service

numbers in its pre-existing relational database long before any subscriber searches for a given property. EquiMine's central system automatically matches property title records to its pre-existing contact graph as part of its routine database ingestion process.

28. Demonstrating that these numbers reside in a pre-existing directory, EquiMine pre-processes and structures the cellular data prior to subscriber searches. Before a user ever requests a "skip trace," EquiMine's internal database has already: (a) classified line types as "Mobile" versus "Landline"; (b) ranked multiple numbers in order of contact probability; and (c) scrubbed the numbers against state and federal Do Not Call registries to apply visual "DNC" flags. This extensive data processing and categorization cannot occur instantaneously during a user transaction; it is the hallmark of a static, pre-compiled commercial directory.

29. In reality, clicking "Place Order" or "Skip Trace' does not fetch or generate new contact information. It merely executes a visual unmasking function—acting as a UI paywall that toggles a database field from masked to unmasked in exchange for subscriber credits or subscription fees. Because EquiMine compiles, indexes, and holds Plaintiff's cellular telephone number in its central database ready for unmasking, Plaintiff's mobile number is "listed in a directory" within the plain meaning of Colo. Rev. Stat. § 6-1-304(4)(a)(I) the moment EquiMine ingests and indexes it into the PropStream platform.

**DEFENDANT'S CONTINUOUS AND PRE-EXISTING UNLAWFUL LISTING**

30. At all relevant times during the applicable statute of limitations, Defendant compiled, indexed, and listed Plaintiff's and Class Members' cellular telephone numbers within its central PropStream commercial directory without obtaining affirmative consent. Defendant's statutory violation under Colo. Rev. Stat. § 6-1-304(4)(a)(I) occurred the moment Defendant knowingly ingested, structured, and included those cellular telephone numbers in its searchable commercial database.

31. Defendant maintains its PropStream commercial directory in a live, continuously accessible state, actively holding out, exposing, and offering Plaintiff's and Class Members' cellular telephone numbers for commercial sale to paying subscribers and free-trial users

nationwide. At all times, Plaintiff's mobile number has been fully indexed, linked to Plaintiff's real property, and retrievable by any subscriber searching Defendant's directory.

32. A search query or "skip trace" executed on the PropStream platform does not generate, create, or initiate a listing. Rather, any search query performed on the platform merely unmasks pre-existing cellular contact data that Defendant has already harvested, categorized, and listed in its central commercial directory. The listing exists independently of, and prior to, any individual user query.

33. Through this pre-compiled directory architecture, Defendant actively monetizes, sells, and disseminates the cellular telephone numbers of Plaintiff and Class Members to real estate investors, brokers, commercial telemarketers, and third-party subscribers across the country.

**THE EXCLUSIVELY COMMERCIAL AND TRANSACTIONAL NATURE OF PROPSTREAM DATA**

34. Defendant's collection, indexing, listing, and unmasking of Plaintiff's and Class Members' cellular telephone numbers is an exclusively economic act driven solely by Defendant's desire for commercial profit. Defendant does not publish cellular telephone numbers for journalistic, educational, political, or public-interest purposes.

35. Plaintiff's and Class Members' cellular telephone numbers are matters of purely private concern. They contain no information regarding public officials, public affairs, news, or matters of legitimate public interest.

36. The contact output furnished by PropStream consists strictly of raw, transactional data points (names, addresses, landlines, and cellular telephone numbers). Defendant's directory output is entirely unmixed with editorial commentary, news articles, public interest guides, or expressive opinion speech.

37. Defendant discloses cellular telephone numbers strictly as part of a commercial transaction with its paying subscribers and free-trial users. Defendant's directory output serves solely the individual economic interests of Defendant (as the seller) and its commercial subscribers (as real estate investors, brokers, and telemarketing solicitors seeking sales leads).

38. Defendant does not merely link to existing public records. Defendant actively ingests, matches, and compiles scattered data points into a single, centralized, and easily searchable electronic clearinghouse. This centralized aggregation fundamentally alters the privacy character of the data, creating severe privacy, harassment, and telemarketing risks for Colorado residents that scattered, hard-to-obtain public records do not present.

39. Defendant is not a passive conduit, printer, or third-party broadcaster of information created by others. Rather, Defendant is the primary author, editor, and creator of the proprietary PropStream database. Defendant actively harvests, parses, matches, enriches, and structures raw, disparate data points into a new, proprietary B2B sales product that did not previously exist in public records.

40. Defendant acts knowingly and willfully when listing Colorado cellular telephone numbers. Defendant is fully aware that its database contains private mobile numbers belonging to Colorado residents, knows it has never requested or received opt-in affirmative consent from those residents, and nevertheless knowingly lists and monetizes those numbers for commercial profit.

## DEFENDANT'S CONDUCT HARMS COLORADANS

41. Equimine's practices inflict tangible harm upon Colorado residents by undermining their privacy rights and exposing them to significant risks. The commercial value of consumer data is well-established, with the FTC recognizing that "data is currency" and that larger datasets yield greater potential for analysis and profit.[8] By listing cell phone numbers without consent, Equimine deprives Coloradans of the control over their personal data and its inherent economic value. Consumers are increasingly aware of this value and are willing to pay a premium for services that prioritize data protection.

---

[8] https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploringprivacy-roundtable/091207privacyroundtable.pdf.

42. In fact, individuals' private information has become such a valuable commodity that companies now offer individuals the opportunity to monetize their personal data.[9]

43. These companies' business models capitalize on a fundamental principle underlying the modern information marketplace: Consumers recognize the economic value of their private data. Along these lines, research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[10] A 2014 survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers avoid doing business with companies who they believe do not protect their privacy.[11] The same is true for 80 percent of smartphone users, who say that they avoid using smartphone apps that they don't believe protect their privacy.[12]

44. Defendant's misappropriation of Coloradans' cell phone numbers undeniably deprives state residents of the ability to enjoy their PTFA privacy rights. It also deprives them of the real, quantifiable value of such data.

45. Further, sites like Defendant's "offer a wealth of information that can be exploited by malicious actors."[13] For one, "[b]undling [personal data] all together and making it so easily

---

[9] *See*, *e.g.*, https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-moneydata/; http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-aprice-on-their-personal-data.html; https://techcrunch.com/2023/08/16/caden-lands-15m-to-letusers-monetize-their-personal-data/; https://www.theverge.com/2019/6/11/18661595/facebook-study-app-monitor-phone-usagepay; https://sifted.eu/articles/gener8; https://www.theverge.com/2012/2/8/2785751/google-screenwise-panel-web-monitoring-knowledge-networks; https://www.sidehustlenation.com/get-paid-for-your-data/; https://millennialmoneyman.com/get-paid-for-your-data/.

[10] *See*, *e.g.*, J. Y. Tsai, S. Egelman, L. Cranor, A. Acquisti. The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study. Information Systems Research, 2010 https://www.heinz.cmu.edu/~acquisti/papers/acquisti-onlinepurchasing-privacy.pdf.

[11] *See* https://web.archive.org/web/20190820142832/http://www.theagitator.net/wpcontent/uploads/012714_ConsumerConfidenceReport_US1.pdf at p. 3.

[12] *Id.*

[13] https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams.

accessible can … put ordinary people at risk of … stalking and other forms of harassment."[14] Second, sites like Defendant's contain "comprehensive data [that] allows cybercriminals to build detailed profiles of potential victims, making it easier to craft convincing scams or carry out identity theft."[15] This "put[s] almost anyone within the reach of fraudulent telemarketers[]" and other wrongdoers.[16]

46. Information disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[17] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[18]

47. Making matters worse, "[o]nce marked as receptive to [a specific] type of spam, a consumer often is bombarded with similar fraudulent offers from a host of scam artists."[19]

48. Defendant's collection and display of Coloradans' cell phone numbers without consent frustrates the legislative intent of the PTFA to safeguard privacy and protect consumers from telemarketing fraud.

49. Defendant's practice of commercially listing cellular telephone numbers without affirmative consent directly impacts thousands of Colorado residents across the state whose mobile numbers are compiled, indexed, and exposed on propstream.com.

50. Colorado residents whose cellular telephone numbers are listed on PropStream have zero contractual relationship, contact, or bargaining power with Defendant. These residents

---

[14] https://innovation.consumerreports.org/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf.
[15] https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams.
[16] http://www.nytimes.com/2007/05/20/business/20tele.html.
[17] *Id.*
[18] https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statementfederal-
trade-commission-fraud-against-seniors/agingtestimony.pdf at p. 1.
[19] *Id.* at p. 3.

have no prior notice of Defendant's operations and no reasonable opportunity to negotiate or prevent the commercial exploitation of their personal mobile data.

51. Defendant's widespread commercial listing of unconsented mobile numbers inflicts significant ongoing harm on the Colorado public by stripping residents of statutory privacy controls and exposing them to heightened risks of harassment, spam, scams, and unwanted commercial telemarketing.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons in Colorado whose cellular telephone numbers were listed on Defendant's website, www.propstream.com, during the applicable statute of limitations.

53. Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

54. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

55. The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

56. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Defendant is a data broker for investors and real estate agents. On information and belief, Defendant stores millions of phones numbers in its database, and the proposed Class contains thousands of Colorado residents if not many more.[20] The proposed Class thus has so many members that joinder of all members is impracticable.

---

[20] While discovery will reveal the precise size of the proposed Class, the set of Colorado

57. Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a. whether Defendant collected and publicly disseminated Plaintiff's and the Class's cellular telephone numbers;
b. whether Defendant unlawfully disclosed and continues to disclose its users' cellular telephone numbers in violation of the PTFA; and
c. whether Defendant disclosed Plaintiff's and the Class's cellular telephone numbers without consent.

58. Typicality: Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, had his cellular telephone number collected and disclosed by Defendant, without his consent.

59. Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seek to represent; the PTFA claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intend to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

---

individuals whose cell phone numbers are listed in Defendant's directory is likely to number in the tens or hundreds of thousands.

60. The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b. The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c. When Defendant’s liability has been adjudicated, all Class Members’ claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h. Class Members’ interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action.

61. Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

62. Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

## First Claim For Relief

## Violation Of The Prevention Of Telemarketing Fraud Act

## COLO. REV. STAT. § 6-1-304, Et Seq.

63. Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

64. Colo. Rev. Stat. § 6-1-304(4)(a) explicitly states that "[o]n or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly: (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing."

65. Defendant has failed to comply with this PTFA mandate. Defendant knowingly lists Coloradans' cell phone numbers. The website propstream.com clearly provides users with the ability to search for individuals and obtain cellular phone numbers as part of its sales prospecting software. The very nature of the site, which aggregates and displays this data, demonstrates knowledge of the presence of cell phone numbers within its database.

66. Defendant's website, propstream.com, undeniably functions as a "directory." As defined, a directory is an "electronic resource containing lists of information, usually in alphabetical order, for example people's phone numbers or the names and addresses of businesses in a particular area."[21] Defendant's operations fully align with this definition, as it allows users to search for names, email addresses, and phone numbers in a structured manner.

67. Defendant engages in this conduct for a commercial purpose. Defendant's business model is based on collecting and providing access to personal data, a commodity with inherent

[21] *See* Oxford Learner's Dictionary, *Directory*, https://www.oxfordlearnersdictionaries.com/us/definition/english/directory.33 (last visited Apr. 29, 2026).

monetary value. Defendant recognizes this fact; it charges for subscription access for its users to increase the number of searches that they can conduct.

68. Defendant never requests nor receives Coloradans' "affirmative consent, through written, oral, or electronic means, to such listing." Instead, Defendant compiles and lists the cell phone numbers of Coloradans with whom it has no prior engagement, no connection, and who are often unaware of the site's existence or its unauthorized publication of their personal information.

69. Defendant's misappropriation of Class Members' personal data, including its economic value, has directly infringed upon Class Members' PTFA privacy rights. This deprivation extends to the real, quantifiable value of such data. Furthermore, it has exposed Class Members to elevated and unnecessary risks of harassment, scams, and unwanted telemarketing solicitations.

70. As a direct and proximate result of Defendant's unauthorized listing and monetization of Plaintiff's and Class Members' cellular telephone numbers, Plaintiff and Class Members have suffered actual damages, including: (a) deprivation of the real, quantifiable commercial value of their personal data; (b) severe infringement upon their legally protected statutory privacy rights under Colo. Rev. Stat. § 6-1-304(4)(a)(I); and (c) nuisance, annoyance, and time spent mitigating exposure to unwanted solicitations.

71. Defendant has generated substantial commercial revenue and profits by selling subscription access and "Skip Trace Credits" to unmask Plaintiff's and Class Members' cellular telephone numbers. Defendant has been unjustly enriched through the unauthorized monetization of Class Members' private mobile data, and Plaintiff and the Class are entitled to disgorgement of all profits Defendant unjustly obtained through this unlawful practice.

72. Thus, on behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendant to comply with the PTFA; (3) penalties, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars and not more than five hundred dollars for each first offense, and at least five hundred dollars and not more than one thousand dollars for

each second or subsequent offense; and (4) reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

## **REQUEST FOR RELIEF**

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel.

b. Declaring that Defendant's actions, as set out above, violate Colo. Rev. Stat. § 6-1-304(4)(a)(I).

c. Awarding penalties, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars and not more than five hundred dollars for each first offense, and at least five hundred dollars and not more than one thousand dollars for each second or subsequent offense.

d. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, inter alia, an Order requiring Defendant to comply with the PTFA.

e. Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

f. Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable.

g. Awarding such other and further relief as equity and justice may require.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: September 2, 2026

CROSNER LEGAL, P.C.

By: */s/ Michael T. Houchin*

MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com
*Attorneys for Plaintiff and the Proposed Class*